UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA :
:
VS. : CR No. 06-124-02ML
:
ROGER A. MURRAY :

# MEMORANDUM IN SUPPORT OF MOTION FOR SENTENCE CONSIDERATION (REDACTED)

## I. INTRODUCTION

Roger A. Murray respectfully submits this memorandum to assist the Court in determining a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of sentencing. 18 U.S.C. § 3553(a)(2005). Additionally, Mr. Murray submits this memorandum in support of his Motion for Sentencing Consideration advocating for a sentence outside the suggested guideline range or in the alternative in accordance with the Base Offense Level rather than the Career Offender Provisions.

## II. PROCEDURAL BACKGROUND

On October 3, 2006, the Rhode Island State Police and Drug Enforcement Agency executed a search warrant at Mr. Murray's residence at 315 Shady Valley Road, in Coventry, Rhode Island. Contemporaneously with the search, Mr. Murray was arrested during a motor vehicle stop as he left the residence.

A federal grand jury indicted Mr. Murray November 1, 2006. On November 6, 2006, Mr. Murray appeared before Magistrate Judge Almond for arraignment and plead not guilty to the three count indictment. On February 15, 2007, Mr. Murray appeared

before the Honorable Justice Mary M. Lisi, Chief Judge and plead guilty to the charges against him. Sentencing is scheduled for May 25, 2007.

## III. SENTENCING CONSIDERATIONS

### A. General

In determining the appropriate sentence for a criminal defendant, the Court is bound to consider the sentencing factors set forth in 18 U.S.C. § 3553(a). The statute requires the Court to consider the nature and circumstances of the offense and the history and characteristics of the defendant, the kinds of sentence available, the need to avoid unwarranted sentencing disparity, the need to provide restitution, and the suggested guideline range. 18 U.S.C. § 3553(a)(1), (a)(3)-(7). The primary sentencing mandate of § 3553(a) directs the sentencing court to impose the minimally-sufficient sentence to achieve the statutory purpose of punishment – justice, deterrence, incapacitation, and rehabilitation: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2).]" 18 U.S.C. § 3553(a) (emphasis added).[1] This provision, the so called "parsimony provision", is the umbrella under which all other sentencing factors and considerations fall. It represents the ultimate goal of sentencing and reflects the maximum sentence that a court may

---

[1] The statute provides, in pertinent part, that
"the court consider the need for the sentence imposed-
(A) to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;"
18 U.S.C. § 3553(a)(2) (2005).

impose. *United States v. Denardi*, 892 F.2d 269, 276-77 (3rd Cir. 1989) (Becker, J., concurring in part, dissenting in part).

The United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005) rendered the Federal Sentencing Guidelines advisory rather than mandatory. Instead of being bound by the Sentencing Guidelines, *Booker* now "requires a court to consider Guideline ranges, . . . but permits the court to tailor the sentence in light of other statutory concerns as well, see § 3553(a)." *Id.* at 245-46. Although no longer mandatory, the Federal Sentencing Guidelines are still a factor that the court must consider in making the ultimate determination of the appropriate sentence to impose in any criminal case.

The post *Booker* sentencing process mandated by the First Circuit requires the District Court Judge to first consult the guidelines – calculate the appropriate range and then decide whether or not to exercise discretion and sentence outside of the guideline range, *United States v. Jimenez*, 440 F.3d 514, 518-519 (1st Cir. 2006); *United States v. Thurston*, 456 F.3d 211, 215 (1st Cir. 2006).

The defendant respectfully requests that this Honorable Court impose a sentence below the advisory guideline range or in the alternative in accordance with the Base Offense Level calculation set forth in the Presentence Investigation Report.

**B. Personal Background**

The Presentence Investigation Report, Part C. Offender Characteristics, provides a comprehensive and accurate history of Mr. Murray background, including family relations, education, employment, substance abuse, and criminal history. The undersigned defers to that report as it relates to this information, and merely supplements the same below.

[redacted]

[redacted]

[redacted]

### C. Nature of the Offense

One of the factors that the Court must consider in sentencing Mr. Murray is "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The charges in this case are clearly serious and carry a maximum of 20 years in prison.

In this case, although the plan of Mr. Murray's co-defendant Gregory M. Thompson would ultimately have resulted in the manufacture of methamphetamine, Thompson only engaged in the first stages of such production, specifically the extraction of ephedrine from ma huang ephedra plants, which apparently only yielded a residue that field tested positive for ephedrine but does not appear to have been submitted for further testing or weight. See Exhibit A attached hereto, Report of Investigation dated

10/04/2006. The ephedrine utilized for calculation of Mr. Murray's Base Offense Level was a bottle diet capsules seized in their original container labeled "Thermal Red". There is no evidence that these capsules had undergone and type of chemical processing in furtherance of the production of methamphetamine. According to Mr. Thompson's recorded statement, his intention was to sell the extracted ephedrine to his friends "out west". See Exhibit B attached hereto, Transcript of Recorded Statement of Gregory Thompson taken by the R.I.S.P. and D.E.A. on 10/2/06 at 5:50pm, which provides in pertinent part:

> 121. Q. Okay. And was your intent after extracting the Ephedrine from the plant?
> A. Yeah, I wasn't sure. I was – I had, I had some friends I might try to call up and sell Ephedrine too out west 'cause that's what they'd rather have and they can make their own Speed and they make more money.
>
> . . .
>
> 123. Q. Okay. And so you, you were going to make some phone calls to see whether you could sell this Ephedrine in –
> A. Right.
> 124. Q. . . . it's extracted state.
> A. In it's extracted state, exactly. And –
> 125. Q. So they could complete –
> A. Right.
> 126. Q. . . . the Methamphetamine.
> 127. A. You know, that's – I didn't really want to get involved with, with making it 'cause I'm not really good at it, you know what I'm saying. I could fuck – I could, I could lose it all trying to make the Methamphetamine itself, but the – this is a more basic process, do you understand? You know, this is more – this was – this I, this I knew, this I knew I could figure out. I had – but really thought I could and I didn't 'cause it didn't come out like it was supposed to. But uh –
> 128. Q. Okay.
> A. . . . I thought I could.

**D. Minor Role**

Additionally, Mr. Murray played a very minor role in the course of this offense. According to all the police reports, as well as Mr. Thompson's recorded statement, Mr. Murray appears merely to have given Mr. Thompson permission to utilize his detached garage/shed to extract ephedrine, and accepted a U.P.S. package containing iodine that was delivered to his residence. In fact, according to Mr. Thompson, he told Mr. Murray that it was not illegal to make ephedrine. See Transcript of Recorded Statement of Gregory Thompson taken by the R.I.S.P. and D.E.A. on 10/2/06 at 5:50pm, which provides in pertinent part:

28. Q. Okay. When was the last time you were at his house?
A. (inaudible) football Sunday.
29. Q. This past Sunday?
A. Yes.
30. Q. Okay. And you stated you were watching football?
A. Yes. Watch it on numerous weekends.
31. Q. All right.
A. He's got a big screen.
32. Q. Were you doing anything else, any other activities at his house this past Sunday?
A. I was, I was kind of just doing my little experiments on that thing, seeing if, you know. <u>I told him what we – it was – Its not illegal to make Ephedrine and that kind of put him in a little chicken baggage.</u>

. . .

250. Q. You didn't want to bring it (iodine) back to work.
A. I didn't really want it – I didn't really want to – I was thinking I'm just gonna finish the Epherine and sell it. I really didn't want to get involved in it. 'Cause that's what I told – I explained to him, <u>I said 'Look this ain't against the law. You can buy Ephedrine in any store,'</u> which you can, you can go in and buy Epherine, but not in like bulk like that, but it – you're – it's a – you're in a gray area, you know. Me having Ephedrine is one thing, me having another (inaudible) on the Epherine is, is a different matter.

> So I told him, look I can just sell the fucking Epherdine and make a few bucks.

Further, when asked whether Mr. Murray was present when he (Thompson) was attempting to extract the ephedrine, Mr. Thompson stated as follow:

33. Q. Okay. So you said you –
A. (inaudible)
34. Q. . . . were doing your experiments –
A. Yeah.
35. Q. . . . and, and what, what, what was the experiments . . .
A. I was trying to make Ephedrine.
36. Q. You were trying to make Ephedrine?
A. I was trying to.
37. Q. Okay. Where were you trying to make Ephedrine?
A. Out in his garage.
38. Q. In his garage?
A. Yes.
39. Q. Okay. Is this a barn?
A. It's a barn, whatever, I don't know whatever you want to call it. She called it a shed.
40. Q. A shed?
A. Yeah, she called it a shed.
41. Q. So it's a shed. So, so on Sunday was he there with you –
A. He was watching (inaudible)
42. Q. . . . (inaudible) . . .
A. He s[t]ays in and watched with hi[s][2]—No, he doesn't know shit, he's – nobody knows about this out here. He, he couldn't help me if he wanted to.

There is no evidence that Mr. Murray was ever actually present and participating in the extraction of the ephedrine.

With respect to the iodine delivery to Mr. Murray's residence, Mr. Murray has always maintained that he did not give Mr. Thompson, or any other person, permission to deliver iodine to 315 Shady Valley Road. Mr. Murray maintains, and Mr. Thompson's

[2] The actual transcript reads "He says in and watched with hi". See attached. The transcription, however, as typed makes no sense. The subject matter of the questioning was that Mr. Thompson was at Mr. Murray's residence on football Sunday, attempting to extract ephedrine. The context of the conversation lends to the conclusion that Mr. Thompson said "He stays (not says) in and watched [presumably the football game] with his (not hi) [presumably girlfriend or some other guest].

statement tends to support, that he was told by Mr. Thompson after the iodine was already ordered that a package was being delivered to 315 Shady Valley Road. See Transcript of Recorded Statement of Gregory Thompson taken by the R.I.S.P. and D.E.A. on 10/2/06 at 5:50pm, which provides in pertinent part:

189. Q. Did you have any conversation with Roger since Sunday about him receiving a package for you?
A. Yeah I told him I might have something mailed to his house.
190. Q. Okay.
A. And I just said just if you can, hold on to it for me.

The significance of this conversation is only apparent upon analyzing the time frame in which it was made. The Sunday referred to above is October 1, 2006. This is known because the arrest was made on Tuesday October 3, 2006. According to the affidavit of R.I.S.P. Detective Matthew Moynihan, in the application for the search warrant of 315 Shady Valley Road, on September 26, 2006, Jerry Banks, an employee of Jeffers Company in Alabama, contacted the Coventry Police relative to an order of 16 pints of iodine by a Frankie Emert of Cathedral City, California, which was to be delivered to a Roger Murray at 315 Shady Valley Road, Coventry, Rhode Island.

It is apparent from this sequence of events that Mr. Thompson through Frankie Emert ordered iodine and had it sent to Mr. Murray at the 315 Shady Valley Road address sometime prior to September 26, 2006, however, unbeknownst to Mr. Murray until sometime between October 1, 2006 and October 3, 2006. It is clear that conversation referenced above, in which Mr. Thompson informed Mr. Murray that a package might be delivered to Mr. Murray's residence, occurred between Sunday October 1, 2006 and Tuesday October 3, 2006, clearly after the iodine was ordered on or about September 26, 2006. Therefore, it is clear that Mr. Murray did not give Mr.

Thompson permission to have the iodine delivered to his residence at 315 Shady Valley Road. In fact, Mr. Thompson stated that Mr. Murray was upset to learn that the package was being delivered to his residence. See Transcript of Recorded Statement of Gregory Thompson taken by the R.I.S.P. and D.E.A. on 10/2/06 at 5:50pm, which provides in pertinent part:

218. Q. So you had the package shipped to –
A. Roger.
219. Q. Roger who?
A. Murray.
220. Q. At which address?
A. I don't know his address, I told you that, Coventry.
221. Q. Okay, Coventry.
A. Yeah.
222. Q. Okay. And, and when was he supposed to get that package?
A. Well he, he was kind of upset with me about getting it (laughing). And he – that's what I was meeting him for today, "What the fuck's this shit? My old lady's going nuts. Let's put this shit in your car."

[redacted].

**E.** [redacted]

[redacted]

[redacted]

## F. Base Offense Level vs. Career Offender Provisions

Upon receipt and review of the Presentence Investigation Report, Mr. Murray informed the undersigned that he was under the misunderstanding that pursuant to Section 2.e. of the Plea Agreement executed on February 14, 2007, Government's

agreement not to file a sentencing enhancement pursuant to 21 U.S.C. § 851 meant that he would not be considered a career offender for the purposes of sentencing, and thus would not be sentenced according to the Career Offender Provision of the sentencing guidelines, but rather would be sentenced according to the Base Offense Level for this offense.

To do so would not ignore Mr. Murray's criminal history, because even under the Base Offense Level calculation, his criminal history is taken under consideration in the Criminal History Categorization. Considering Mr. Murray's criminal history, he is categorized a Level VI. According to the Presentence Report, Mr. Murray's Base Offense Level is 20, and with a 3 point reduction for Acceptance of Responsibility, his Total Offense Level would be 17. At this level he would face a sentence in the range of 51-63 months. If sentenced according to the Career Offender Provisions his Total Offense Level would be 29, at which level he would face a sentence in the range of 151-188 months. The difference between these two calculations is drastic, and the defendant submits should be taken into consideration by the Court when considering an appropriate sentence.

**G. Conclusion**

The defendant respectfully suggests that a sentence within the Career Offender Provisions is greater than necessary" to achieve the statutory purposes of sentencing." 18 U.S.C. § 3553(a)(2005) and would result in Mr. Murray missing almost all opportunity to raise and financially support his children. Considering the minimal degree of his involvement in Mr. Thompson's activities, the preliminary nature of Mr. Thompson's operation in the actual production of methamphetamine, the relatively small amount of

Ephedrine involved in this case[3], [redacted] and his misunderstanding relative to the application of the Career Offender Provisions, Mr. Murray respectfully requests that he be given a sentence below the Career Offender Provision calculation or in the alternative that he be sentenced in accordance with the Base Offense Level as set forth in the Presentence Investigation Report.

ROGER MURRAY
By his attorney,

/s/ Albert E. Medici, Jr., Esq.
MEDICI & SCIACCA, P.C.
1312 Atwood Avenue
Johnston, Rhode Island 02919
Telephone 401-946-3910
Facsimile 401-942-4918
amedici@medicisciacca.com

[3] The Presentence Investigation Report acknowledges that the amount of Ephedrine at issue in this case is 4.4 grams. See Presentence Investigation Report, dated 5/6/2007, Part A, para. 13.

CERTIFICATION

I, hereby, certify that I electronically filed and served a copy of the within on Mary Rogers, Assistant United States Attorney on the 21st day of May, 2007.

/s/ Albert E. Medici, Jr., Esq.